## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DAVID W. ZICKEL,

    *Plaintiff,*

vs.             Case No. 24-CV-2506-EFM-ADM

CITY OF OVERLAND PARK, KANSAS,
and SIMON HAPPER,

    *Defendants.*

## MEMORANDUM AND ORDER

This case arises out of the termination of Plaintiff David W. Zickel's employment as a

detective with the Overland Park Police Department ("OPPD"). Plaintiff filed this lawsuit against

the City of Overland Park (the "City") and Defendant Simon Happer, the interim police chief at

the time of his termination. This Order concerns Plaintiff's claims against Defendant Happer,

which include (1) violation of his First Amendment right under 42 U.S.C. § 1983; (2) violation of

his Fourteenth Amendment rights under § 1983; (3) defamation; and (4) blacklisting. Defendant

Happer moves to strike Plaintiff's defamation claim under the Kansas Public Speech Protection

Act (Doc. 17).[1] He also moves to dismiss Plaintiff's claims under Federal Rule of Civil Procedure

---

[1] Defendant Happer and the City previously moved to strike Plaintiff's defamation claim in the First Amended Complaint (Doc. 4). Plaintiff subsequently filed a Second and Third Amended Complaint. When the Third Amended Complaint became the operative pleading, Defendant Happer filed a second Motion to Strike (Doc. 17) Plaintiff's defamation claim. Therefore, the Court denies the City and Defendant Happer's original Motion to Strike (Doc. 4) as moot.

12(b)(6) (Doc. 18). For the following reasons, the Court denies Defendant Happer's Motion to Strike and grants in part and denies in part Defendant Happer's Motion to Dismiss.

## I.    Factual and Procedural Background[2]

Plaintiff began working for the City in 2000 as a police officer in the OPPD. He was later transferred to the Property Crimes Unit of the Criminal Investigations Division, serving in the role of detective. Plaintiff had positive performance reviews and no significant disciplinary history during his tenure with the City.

In 2015, Plaintiff began serving as the State Trustee of the Fraternal Order of Police, Lodge 21 (the "FOP"). At Plaintiff's suggestion, the FOP created a charitable foundation (the "Foundation") that received approximately $2.1 million in its first five years of existence. In November 2021, Plaintiff became concerned about how the Foundation funds were being distributed and the lack of transparency from the Foundation board about the Foundation's records. After the board denied Plaintiff's request to look at the Foundation's records, Plaintiff requested a copy of the Foundation's bylaws. Plaintiff then learned that the Foundation's bylaws required him, as State Trustee, to audit the Foundation's books before the annual meeting. Plaintiff repeated his request for access to the Foundation's records.[3]

In January 2022, a new Foundation board took office and ordered a forensic reconstruction of the Foundation's records. But the original Foundation board had wiped their phones and computers of any data related to the Foundation to protect themselves from allegations of misuse of charitable funds.

---

[2] The facts are alleged in Plaintiff's Third Amended Complaint and assumed to be true for the purpose of deciding Defendant's Motion to Dismiss.

[3] Plaintiff does not allege whether he was provided access to the Foundation's records after this request.

In February 2022, Overland Park City Councilman Scott Mosher attempted to dissuade Plaintiff from reporting the misuse of charitable funds. He asked Plaintiff how they could resolve the issue without an investigation. Plaintiff, however, refused to work with him. Councilman Mosher then suggested that the current FOP President remove Plaintiff from his role as State Trustee. The FOP President, however, had no authority to remove Plaintiff because Plaintiff's role was elected and not appointed.

Plaintiff alleges that Councilman Mosher wanted to keep the misuse of Foundation funds private because his family received more than $200,000 from the Foundation after his son's tragic death in the line of duty. According to Plaintiff, the Mosher family received considerably more than any other family of a fallen officer. Plaintiff also alleges that when Councilman Mosher's son was Foundation president, he misused the Foundation's funds.

Around the same time, the OPPD began the process to elect a new police chief. Councilman Mosher was serving on the public safety committee at the time and had influence over who was elected. Defendant Happer applied for the position. Defendant Happer was also connected to the misuse of Foundation funds because he and other OPPD officers attended an event in Washington D.C., and he knew or should have known that using Foundation funds to travel was improper.

In March 2022, Plaintiff reported his concerns about the misuse of Foundation funds to the professional standards unit of the OPPD. Plaintiff believes this report is the first time the command staff heard of the misuse of funds.

In May 2022, because the forensic accountant hired by the Foundation board determined that there was evidence of misuse, the OPPD and the FOP asked the Johnson County District Attorney's Office to investigate the matter. The investigation lasted 15 months, concluding in October 2023, and three sergeants and one officer were on paid administrative leave for the entirety

of the investigation. Ultimately, the District Attorney's Office was unable to recover any of the "wiped" data.

The OPPD conducted its own investigation in October 2023 by attorney Rick Guinn. After Guinn completed his investigation, Defendant Happer, who was then interim chief, summoned Plaintiff to his office. Happer told Plaintiff that Guinn found him lacking in credibility. Happer offered Plaintiff the opportunity to resign by December 8 or be terminated, with his untrustworthiness reported to the Kansas Commission on Police Officer Standards and Training ("KS-CPOST"). Plaintiff refused to resign from his position. The four individuals who were on paid leave were also given the opportunity to resign or be fired. They all resigned, and their termination was not reported to KS-CPOST.

On December 8, instead of terminating Plaintiff's employment, Happer ordered an honesty investigation to be conducted. This investigation also was conducted by Guinn, who interviewed Plaintiff and asked him to recall events occurring almost ten years prior. Plaintiff responded that he was unable to clearly remember events that occurred so long ago. Guinn also interviewed witnesses, although none of these witnesses were helpful to Plaintiff. During the pendency of the investigation, Plaintiff told Defendant Happer that many officers over the age of 40 have memory issues while under stress. Plaintiff explained that he did not have an honesty issue, but a memory issue.

After the conclusion of the investigation, Plaintiff further explained to Guinn that during the investigative interview, he declined to speculate or provide ambiguous answers. Instead, he focused on things he remembered clearly and precisely. If he did not remember the incident clearly and precisely, he said that he could not recall the event. Defendant Happer, who was also present for the conversation, stated that he had memory issues as well because of his age (60 years old),

but that he thought Plaintiff should have remembered more during his interview with Guinn. Defendant Happer further commented that Plaintiff's memory issues could be a Brady issue, requiring disclosure to attorneys.

On April 15, 2024, Defendant Happer terminated Plaintiff based on the findings of the honesty investigation and for violating the OPPD's and the City's policies. Happer stated that comments Plaintiff made to Guinn during the investigation were inappropriate and a violation of the OPPD's policy concerning the conduct of officers. Defendant Happer subsequently filed a report with the KS-CPOST regarding Plaintiff's termination. Happer also sent a *Giglio* letter[4] to Kate Brubacher, the United States Attorney for the District of Kansas; Stephen Howe, the Johnson County, Kansas District Attorney; and Melissa Ruttan, Chief Prosecutor for the City of Overland Park, Kansas. In the *Giglio* letter, Happer stated that the City terminated Plaintiff "based on various policy violations, including a violation of our honesty and truthfulness policy." Plaintiff alleges that Defendant Happer's statements in KS-CPOST report and the *Giglio* letter were false.

Plaintiff filed this lawsuit in November 2024 asserting claims against Defendant Happer and the City. In his Third Amended Complaint, he asserts four claims against Defendant Happer: (1) violation of his First Amendment rights under 42 U.S.C. § 1983; (2) violation of Fourteenth Amendment rights under 42 U.S.C. § 1983; (3) defamation; and (4) blacklisting. He also asserts claims for age discrimination and wrongful discharge in violation of public policy against the City. Defendant Happer moves to strike Plaintiff's defamation claim under the Kansas Public Speech Protection Act ("KPSPA"). He also moves to dismiss all of Plaintiff's claims against him for

---

[4] *Giglio v. United States*, 405 U.S. 150 (1972).

failure to state a claim. The Court will consider Defendant Happer's Motion to Dismiss first and then the Motion to Strike.

## II.      Defendant Happer's Motion to Dismiss (Doc. 18)

### A.    Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[5] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[6] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[7] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well as the grounds on which each claim rests.[8] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[9] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[10] If the allegations in the

---

[5] Fed. R. Civ. P. 12(b)(6).

[6] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[7] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[8] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[9] *Iqbal*, 556 U.S. at 678–79.

[10] *See id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[11]

### B.    Plaintiff's § 1983 Claims

Plaintiff sues Defendant Happer in his official capacity alleging that his conduct violated Plaintiff's First and Fourteenth Amendment rights. Defendant Happer argues that Plaintiff's claims must be dismissed because he is entitled to qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[12] When asserting this defense at the motion to dismiss stage, the plaintiff "must allege facts sufficient to show (assuming they are true) that the [1] defendant[ ] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time."[13] The district court may address these two prongs in any order.[14] However, failure by the plaintiff to satisfy either prong requires a court to grant qualified immunity.[15] Here, Defendant Happer argues that Plaintiff's claims fail as to the first prong of the qualified immunity analysis.

### 1.    First Amendment Retaliation

Plaintiff alleges that Defendant Happer terminated him and/or retaliated against him for exercising his First Amendment free speech rights. He alleges that he was wrongly terminated

---

[11] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[12] *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, (2015)).

[13] *Id.* (alterations in original) (*quoting Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)).

[14] *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[15] *Id.* (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

because he reported his concerns about the misuse of Foundation funds to the professional standards unit of the OPPD. "[T]he First Amendment prevents state and local governments from 'condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"[16] However, "a public employer must be able to control the operations of its workplace,"[17] and the Supreme Court has "made clear a governmental employer may restrict speech made pursuant to an employee's official duties." In light of this precedent, the Tenth Circuit employs a five-step inquiry for First Amendment retaliation claims called the "*Garcetti/Pickering*" analysis. The elements for this analysis are:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.[18]

A plaintiff must show all five elements to prevail on his claim.[19] "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury."[20]

---

[16] *Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021) (alterations in original) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

[17] *Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017) (citation omitted); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (noting that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer.").

[18] *Duda*, 7 F.4th at 910 (quoting *Helget*, 844 F.3d at 1221).

[19] *Id*. at 911 (citing *Helget*, 844 F.3d at 1225).

[20] *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018) (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)).

Defendant Happer challenges Plaintiff's claim at the first step of the analysis. Thus, he argues that Plaintiff did not speak pursuant to his official duties. "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of the employer control over what the employer itself has commissioned or created.'"[21]

The Tenth Circuit takes a broad view of when employees are speaking as part of their official duties.[22] Generally, district courts must "take a practical view of all the facts and circumstances surrounding the speech and the employment relationship."[23] District courts must employ a "case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties."[24]

"The guiding principle is that speech is made pursuant to official duties if it involves 'the type of activities that the employee was paid to do.'"[25] Following this principle, "if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."[26] Even speech involving "activities that the employee

---

[21] *Id*. (quoting *Couch v. Bd. of Trs. of Mem. Hosp.*, 587 F.3d 1223, 1235 (10th Cir. 2009)).

[22] *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (citation omitted).

[23] *Brammer -Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422).

[24] *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010).

[25] *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (alterations omitted) (quoting *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007)).

[26] *Id*. (quoting *Brammer-Hoelter*, 492 F.3d at 1203).

is not expressly required to perform" may be spoken pursuant to an employee's official duties.[27] "The ultimate question is whether the employee speaks as a citizen or instead as a government-employee—an individual acting 'in his or her professional capacity.'"[28]

Plaintiff maintains that his report to the professional standards unit of the OPPD was made in his capacity as a private citizen. He argues that in *Lane v. Franks*,[29] the United States Supreme Court refined its approach to protective speech when it found that an employee's testimony in court pursuant to a subpoena was outside the employee's normal job duties and thus was protected speech.[30] According to Plaintiff, his speech to the professional standards unit was not part of his normal job duties as a detective, and thus, under *Lane*, it is protected.

The Court disagrees. The Tenth Circuit has held that *Lane* did not revise the Supreme Court or the Tenth Circuit's approach to analyzing whether speech is employee speech or private citizen speech.[31] Furthermore, in *Lane*, the Supreme Court addressed the narrow question of "whether the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities."[32] Plaintiff's speech here was neither sworn testimony nor compelled by subpoena. Thus, *Lane* is distinguishable from this case.

---

[27] *Brammer-Hoelter*, 492 F.3d at 1203.

[28] *Id*. at 1204 (quoting *Garcetti*, 547 U.S. at 422).

[29] 573 U.S. 228 (2014).

[30] *Id*. at 238.

[31] *See Holub v. Gdowski*, 802 F.3d 1149, 1156 (10th Cir. 2015) (noting that "both *Lane* and *Garcetti* direct us to focus on whether the employee's speech was within the scope of the employee's usual duties, not whether the speech itself was frequent, usual, or customary.").

[32] *Lane*, 573 U.S. at 238.

The facts as alleged in the Third Amended Complaint show that Plaintiff's speech was part of his official duties. Plaintiff was employed as a detective in the property crimes unit, and therefore his speech concerned the type of crime he was being paid to investigate. Furthermore, Plaintiff held the position of state trustee of the FOP because he was a law enforcement officer. He would not have learned about the alleged misuse nor been able to report the misuse of funds to the professional standards unit if he was not employed as a detective with the OPPD. Plaintiff argues that his speech was not part of his official duties because he was not specifically tasked by the OPPD to investigate the Foundation. But speech may fall within an employee's official duties even if it concerns those duties not explicitly required as part of the employee's day-to-day responsibilities.[33] Thus, the Court is not swayed by Plaintiff's argument.

Additionally, Plaintiff reported the misuse to the professional standards unit of the OPPD, not an outside entity. "[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties."[34] Here, Plaintiff alleges that his report was the first time the command staff had heard of the misuse of the funds. Thus, his report was either within his chain of command or pursuant to the reporting requirements of the OPPD and therefore bears strong resemblance to speech made in the course of employment.

Accordingly, the Court concludes that Plaintiff was speaking as a government employee when he reported the misuse of funds to the professional standards unit of the OPPD. Therefore,

---

[33] *See Brammer-Hoelter*, 492 F.3d at 1203; *Green*, 472 F.3d at 800-01*; see also Joyce v. N. Metro Task Force*, 2011 WL 2669162 (D. Colo. July 7, 2011) ("There is some support in the law to conclude that, based on this general duty, a police officer speaks pursuant to his official duties when he speaks out about potential criminal activity of any kind.").

[34] *Rohrbough*, 596 F.3d at 747 (citations omitted).

Plaintiff does not allege a constitutional violation as to his First Amendment retaliation claim, and Defendant Happer is entitled to qualified immunity on this claim.

2.    *Fourteenth Amendment Due Process*

Plaintiff alleges that he had a protected property interest in his continued employment, and he was deprived of due process when Defendant Happer ended his employment "single-handedly and in a summary fashion." "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment."[35] An alleged procedural due process violation requires a two-step inquiry: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process."[36] Defendant Happer contends that Plaintiff's due process claim fails at both of these steps. The Court, however, need not address them both because, even assuming Plaintiff had a protected property interest in his employment, Plaintiff fails to allege that he was denied appropriate process.

Public employees with a property interest in continued employment are "entitled to oral or written notice of the charges against [them], an explanation of the employer's evidence, and an opportunity to present [their] side of the story" before termination.[37] Defendant Happer asserts that

---

[35] *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976)).

[36] *Merrifield v. Bd. of Cnty. Comm'rs of Santa Fe*, 654 F.3d 1073, 1078 (10th Cir. 2011) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009)).

[37] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

Plaintiff was given multiple notices and multiple opportunities to present his position before his termination, and thus, he was afforded an appropriate level of process.[38] On March 5, 2024, Defendant Happer met with Plaintiff to issue a preliminary determination that Plaintiff violated officer standards. Plaintiff responded to the allegations through counsel on March 8. In April, Defendant Happer issued a pretermination notice stating the basis for the termination. Plaintiff then participated in a pretermination hearing. On April 15, Defendant Happer affirmed the decision to terminate Plaintiff's employment. Plaintiff appealed his termination to the City's Civil Service Commission. A hearing was held on June 28, where Plaintiff was represented by counsel, and the Commission issued its ruling affirming the City's decision to terminate Plaintiff on August 1. According to Defendant Happer, this process was more than sufficient to satisfy the due process required by the Fourteenth Amendment.

Plaintiff does not dispute that he participated in the pretermination proceedings. Instead, he argues that the honesty investigation was a sham and that Guinn only interviewed individuals with negative information about him. Plaintiff alleges that he was terminated for honesty, not dishonesty. Thus, Plaintiff argues that, if the Court accepts his pleaded facts as true, Defendant offered him no opportunity to be heard.

Plaintiff's argument is somewhat confusing. He appears to be arguing that he was denied procedural due process because the reasons provided for his termination were not the real reason

---

[38] Plaintiff does not allege whether he was given notice and an opportunity to present his position prior to his termination. However, Defendant Happer asks the Court to take judicial notice of Plaintiff's Amended Appeal of Overland Park Civil Service Commission Ruling, which Plaintiff filed in Johnson County District Court, Case No. 24-CV-4585. Plaintiff's Amended Appeal sets forth the termination process in Plaintiff's own words. The Court may take judicial notice of this Amended Appeal without converting Defendant's Motion to one for summary judgment. *See Chen v. Dillard Store Servs.*, 579 F. App'x 618, 622 n.1 (10th Cir. 2014) ("We have held that on a motion to dismiss the court may take judicial notice of pleadings in prior cases without converting that motion to one for summary judgment.").

for his termination. This is not a procedural due process argument but rather one of pretext for his termination. As noted above, if an employee has a property interest in continued employment, he is "entitled to oral or written notice of the charges against [him], an explanation of the employer's evidence, and an opportunity to present [his] side of the story" before termination.[39] Plaintiff was provided a meaningful opportunity to be heard before his termination. Defendant Happer gave Plaintiff at least two pretermination notices, and Plaintiff received an opportunity to respond to both. He was also provided an evidentiary hearing before the Civil Service Commission, which affirmed his termination.

To the extent Plaintiff is relying on the honesty investigation as the basis for his claim, he also fails to allege a lack of process. Plaintiff claims that the honesty investigation was a "sham," but the only factual allegation supporting this claim is that Guinn only interviewed unfavorable witnesses. Plaintiff, however, also alleges that Guinn interviewed him during the investigation. Thus, whatever impact the negative interviewees had on the investigation, Plaintiff was offered an opportunity to be heard and respond.[40] Therefore, Plaintiff does not plausibly allege that he was denied meaningful process as to the honesty investigation.

Overall, the Court finds that Plaintiff received due process prior to his termination. Therefore, Plaintiff fails to allege a violation of his Fourteenth Amendment rights. Defendant Happer is entitled to qualified immunity on this claim.

## C.    Defamation

---

[39] *Harrell v. Stitt*, 2024 WL 3372624, at *3 (10th Cir. July 11, 2024) (quoting *Cleveland Bd. of Educ.*, 470 U.S. at 546).

[40] *See Duprey v. Twelfth Judicial Dist. Court*, 760 F. Supp. 2d 1180, 1222 (D.N.M. 2009) (stating that the plaintiff received an adequate opportunity to be heard even though the investigator did not interview witnesses who were favorable for the plaintiff because the investigator also interviewed the plaintiff).

In his defamation claim, Plaintiff alleges that Defendant Happer caused false and defamatory statements to be published about him in the termination report sent to the KS-CPOST and in the *Giglio* letter Defendant Happer sent to three prosecutor's offices. According to Plaintiff, these documents falsely stated that Plaintiff was fired from his long-time role with the OPPD because he violated policies implicating his honestly and truthfulness and because he engaged in misconduct. Defendant argues that Plaintiff's defamation claims fail as a matter of law because (1) Defendant Happer has absolute immunity from civil liability for the termination report, and (2) Plaintiff fails to allege Defendant Happer acted with malice when he sent the *Giglio* letter. The Court will address each argument in turn.

### 1.    The Termination Report

KS-CPOST is the organization responsible for certifying law enforcement officers. Under K.S.A. § 74-5611a, KS-CPOST is required to "establish and maintain a central registry of all Kansas police officers or law enforcement officers."[41] This registry is "a resource for all agencies who appoint or elect police or law enforcement officers to use when reviewing employment applications of such officers."[42] The statute specifically requires an agency head to issue a report to KS-CPOST within 30 days of the termination of a police or law enforcement officer included in the registry.[43] The report must explain the circumstances under which the officer resigned or was terminated.[44] Terminated officers are permitted to "submit a written statement in response to

---

[41] K.S.A. § 74-5611a(a)(1).

[42] *Id*. § 74-5611a(a)(2).

[43] *Id*. § 74-5611a(c).

[44] *Id*. § 74-5611a(d).

the termination," which will also be included in the registry.[45] The statute further provides that "[t]he agency, agency head and any officer or employee of the agency shall be absolutely immune from civil liability" for a report made under the statute.[46]

Defendant Happer argues that he submitted the termination report to KS-CPOST explaining the circumstances in which Plaintiff was terminated pursuant to K.S.A. § 74-5611a(d), and thus, he is entitled to absolute immunity. In support of his argument, Defendant relies on *Tanksley v. Rice County Sheriff's Office*.[47] In that case, the defendant sheriff sent a report to KS-CPOST after terminating the plaintiff from his position with the Rice County Sheriff's Office.[48] The plaintiff alleged that the contents of the report were false, and that the Sheriff knew they were false when he sent the report.[49] The plaintiff then sued the sheriff and the sheriff's office for tortious interference with prospective contractual relationships, basing his claim on the termination report that the defendant sheriff sent to the KS-CPOST.[50] The defendants argued that they were immune from suit under K.S.A. § 74-5611a(d), and the Court agreed.[51] Although Judge Crabtree acknowledged that the Court must assume for purposes of a motion to dismiss that the plaintiff was right—and thus the statements were false—he concluded that the statute specifically confers

---

[45] *Id*.

[46] *Id*. § 74-5611a(e).

[47] 2021 WL 1210280 (D. Kan. Mar. 31, 2021).

[48] *Id*. at *3.

[49] *Id*.

[50] *Id*. at *20.

[51] *Id*. at *20-21.

absolute immunity from civil liability based on the report, and "[a]bsolute means absolute."[52] Thus, the Court found that the plaintiff could not sue the defendants on the basis of the KS-CPOST report.[53]

Like the plaintiff in *Tanksley*, Plaintiff also alleges that the contents of the termination report sent to KS-CPOST were false. Even assuming that they are—as the Court must under Rule 12(b)(6)—the Court agrees with Judge Crabtree's analysis in *Tanksley* and also concludes that "the statute's promise of 'absolute[ ]' immunity subsumes even the possibility that the report contained false or misleading statements."[54] Thus, Plaintiff cannot sue Defendant Happer for defamation based on the contents of the Termination Report.

Plaintiff acknowledges that *Tanksley* is analogous to this case. Yet, he contends that the statutory immunity only applies when the report contains "the actual circumstances, not the circumstances the employer invents" for the termination. Plaintiff argues that if immunity applied in all instances, then the agency head could make up outlandishly false reasons for termination and the terminated employee would have no recourse.

The Court, however, disagrees. As Defendant Happer asserts, under Plaintiff's theory, every terminated law enforcement officer could file a defamation claim arguing that the content of the report was false, and that claim would survive until a judge or jury determined if the information in the report was true or false. Plaintiff's interpretation essentially renders the

---

[52] *Id*. at *21.

[53] *Id*.

[54] *Id*. at *21 (alteration in original) (citing K.S.A. § 74-5611a(e)(1)).

immunity provision meaningless, and the Court cannot interpret the statute in this way.[55] The statute expressly states that the agency, agency head, or any officer of the agency is "absolutely immune from civil liability for the report." Accordingly, the Court concludes that Defendant Happer has absolute civil immunity for the termination report he sent to KS-CPOST. Plaintiff's defamation claim is dismissed as to this allegation.

### 2. The *Giglio* Letter

As to the *Giglio* letter, Defendant Happer argues that his allegedly defamatory statements are protected by qualified privilege, and therefore Plaintiff was required, but failed, to plead actual malice. A defendant may assert qualified privilege as an affirmative defense to a defamation claim.[56] "Where a defamatory statement is made in a situation where there is a qualified privilege the injured party has the burden of proving not only that the statements were false, but also that the statements were made with actual malice–with actual evil-mindedness or specific intent to injure."[57]

Defendant Happer argues that he is entitled to a qualified privilege because he had a legal duty to send the *Giglio* letter. In support, he cites *Brown v. Skaggs-Albertson's Properties, Inc.*,[58] which states that a qualified privilege "exists when the communication is fairly made by a person in the discharge of some public or private duty whether legal or moral or in the conduct of his own

---

[55] *See Anderson v. Dir., OWCP*, 455 F.3d 1102, 1106 (10th Cir. 2006) ("When applying a statute, we are responsible for interpreting its provisions in a manner that would not render any part of the statute meaningless, redundant, or superfluous.").

[56] *See Dominguez v. Davidson*, 266 Kan. 926, 974 P.2d 112, 117 (1999) (discussing qualified privilege as a defense to a defamation claim).

[57] *Munsell v. Ideal Food Stores*, 208 Kan. 909, 494 P.2d 1063, 1073 (1972).

[58] 563 F.2d 983 (10th Cir. 1977).

affairs in matters where his interest is concerned."[59] But *Brown* sets forth Oklahoma law for qualified privilege, not Kansas law which governs Plaintiff's claim.[60] Under Kansas law, "[a] communication is qualifiedly privileged if it is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, if it is made to a person having a corresponding interest or duty."[61] Thus, "the essential elements of a qualifiedly privileged communication are good faith, an interest to be upheld, a statement limited in its scope to the upholding of such interest and publication in a proper manner only to proper parties."[62]

Kansas law governing qualified privilege differs from Oklahoma law in that it requires the communication to be made in good faith. Defendant does not address this element in his Motion. Furthermore, Plaintiff alleges that Defendant Happer used the letter to retaliate against Plaintiff, indicating that the letter was not sent in good faith. Accordingly, the Court finds that Defendant Happer fails to establish that qualified privilege applies at this juncture. Plaintiff's defamation claim as to the *Giglio* letter survives Defendant's Motion to Dismiss.

## D.    Blacklisting

In Count VI of the Third Amended Complaint, Plaintiff asserts a claim for blacklisting against Defendant Happer. Blacklisting is a statutory claim, arising from K.S.A. § 44-117 *et seq*. Under § 44-117, after an employer has discharged an employee, the employer cannot "prevent or

---

[59] *Id*. at 986.

[60] *See id*. (relying on Oklahoma law in addition to Prosser, Law of Torts, 4th ed.).  Here, Kansas law applies because the alleged tort, defamation, occurred in Kansas. *See Ling v. Jan's Liqours*, 237 Kan. 629, 703 P.2d 731, 735 (1985) (stating that Kansas applies the law of the state where the tort was committed) (citation omitted).

[61] *Luttrell v. United Tel. Sys., Inc*., 9 Kan. App. 2d 620, 683 P.2d 1292, 1294 (1984), *aff'd*, 236 Kan. 710, 695 P.2d 1279 (1985).

[62] *Id*. (*citing Dobbyn v. Nelson*, 2 Kan.App.2d 358, 579 P.2d 721, 723, *aff'd* 225 Kan. 56, 587 P.2d 315 (1978)); *see also Knudsen v. Kan. Gas & Elec. Co*., 248 Kan. 469, 807 P.2d 71, 79 (1991) (citation omitted).

attempt to prevent by word, sign or writing of any kind whatsoever any such discharged employee from obtaining employment from any other person, company or corporation, except by furnishing in writing, on request, the cause of such discharge." An employer who violates the blacklisting statute is guilty of a misdemeanor and may be subject to a fine and 30 days' imprisonment in the county jail.[63] Under K.S.A. § 44-119, an employer "found guilty of the violation of this act" is civilly liable to the party injured.[64]

Defendant Happer contends that Plaintiff does not state a claim for blacklisting because Plaintiff does not allege that Defendant Happer was criminally convicted of violation the statute. In response, Plaintiff argues that a criminal conviction is not required to recover civil penalties under K.S.A. § 44-119. But Plaintiff's argument is refuted by the Tenth Circuit's decision in *Anderson v. United Telephone Co. of Kansas*,[65] where the Tenth Circuit held that a criminal blacklisting conviction is an element of a civil blacklisting claim against an employer under Kansas law.[66]

Plaintiff acknowledges that *Anderson* contradicts his argument. Still, Plaintiff argues that the Tenth Circuit's ruling on this issue conflicts with current Kansas law. Plaintiff points out that in *Rowland v. USA800, Inc*., a Kansas state court found the blacklisting statute provides a cause of action without a criminal conviction.[67] Plaintiff argues that because there is confusion between

---

[63] K.S.A. § 44-118.

[64] K.S.A. § 44-119.

[65] 933 F.2d 1500 (10th Cir. 1991).

[66] *Id*. at 1502-03.

[67] *See Rowland v. U.S.A. 800, Inc.*, No. 14-cv-12 (Harvey County Dist. Ct. Judge Richard B. Walker Feb. 17, 2005) (stating in an unpublished decision that *Anderson* is no longer correct after the Kansas legislature passed K.S.A.

the state and federal court decisions as to whether a criminal conviction is required to hold a defendant civilly liable, the Court should certify the question to the Kansas Supreme Court.

K.S.A. § 60-3201 authorizes federal district courts to certify questions of law to the Kansas Supreme Court if the question "may be determinative of the cause then pending in the certifying court" and "there is no controlling precedent" from the Kansas Supreme Court or Kansas Court of Appeals." The decision to certify is "within the 'sound discretion of the federal court.'"[68] Certification is appropriate where "questions of state law" are "both unsettled and dispositive."[69]

Certification is not necessary in this instance. Although there is one unpublished decision by a state district court judge disagreeing with the Tenth Circuit's ruling in *Anderson*, the Tenth Circuit affirmed *Anderson* seven years after that state court decision was decided.[70] Specifically, in *Painter v. Midwest Health, Inc.*, the plaintiff asked the Tenth Circuit to overrule *Anderson* because it was incorrectly decided or because statutory developments required a different result.[71] The Tenth Circuit rejected these arguments and held that *Anderson* is binding precedent.[72] Because the Tenth Circuit has definitively ruled on this issue and because Plaintiff only points to one unpublished case in his favor, the Court does not find this issue "unsettled." The Court therefore declines to certify this question to the Kansas Supreme Court.

---

§ 44-119a, which provides immunity to employers for disclosing truthful information about former employees but does not specifically extend such immunity to employers who violate blacklisting statute).

[68] *Bruce v. Kelly*, 2021 WL 4284534, at *22 (D. Kan. 2021) (quoting *Hartford Ins. Co. v. Cline*, 427 F.3d 715, 716-17 (10th Cir. 2005)) (further citation and quotations omitted).

[69] *Id.* (quoting *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988)).

[70] *Painter v. Midwest Health, Inc.*, 2022 WL 17332734, at *7 (10th Cir. Nov. 30, 2022).

[71] *Id.*

[72] *Id.*

Because Plaintiff does not allege that Defendant Happer was criminally convicted, he fails to state a claim for blacklisting under Kansas law. Defendant's Motion is granted as to Count VI.

### E.    Conclusion

The Court grants Defendant Happer's Motion to Dismiss as to his § 1983 claims for violation of his First and Fourteenth Amendment rights, his defamation claim based on the termination report, and his blacklisting claim. The Court denies Defendant Happer's Motion as to Plaintiff's defamation claim based on the *Giglio* letter.

## II.    Defendant Happer's Motion to Strike (Doc. 17)

Defendant Happer moves to strike Plaintiff's defamation claim under the Kansas Public Speech Protection Act ("KPSPA"). Because the Court has already dismissed Plaintiff's defamation claim based on the termination report, it will only address the KPSPA's application in the context of Plaintiff's defamation claim based on the *Giglio* letter.

The purpose of the KPSPA is to protect the constitutional rights of a person to petition, speak, and associate freely about "a public issue or issue of public interest," while also "protecting the rights of a person to file meritorious lawsuits for demonstrable injury."[73] As such, it falls under the category of "anti-SLAPP" (Strategic Lawsuits Against Public Participation) statutes enacted by most states.[74] Under the KPSPA, a defendant may move to strike a claim if it is "based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right

---

[73] K.S.A. § 60-5320(b).

[74] *Neuman v. Anesthesia Assoc. of Kan. City, P.A.*, -- P.3d ---, 2025 WL 2177353, at *4 (Kan. Ct. App. Aug. 1, 2025) (citations omitted).

of association."[75] This motion to strike may occur any time within "60 days of the service of the most recent complaint."[76]

The statute sets forth a two-step process for evaluating a motion to strike. First, the movant must make a prima facie case showing that the claim concerns his exercise of the right of free speech, right to petition, or right of association.[77] Second, if the movant succeeds, "the burden shifts to the responding party to establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a prima facie case."[78] A court may only consider pleadings and affidavits while ruling on the second step.[79]

Turning to the first step of the analysis, Defendant Happer argues that the *Giglio* letter falls under both the exercise of the right of free speech and the right to petition. The statute defines the "exercise of the right of free speech" as "a communication made in connection with a public issue or issue of public interest."[80] Defendant Happer briefly asserts that the *Giglio* letter, which was meant to inform local prosecutors that Plaintiff was terminated for issues related to dishonesty that may need to be disclosed to criminal defense attorneys, is an issue of public interest. He ignores, however, that the statute further defines "public issue or issue of public interest" as "an issue related to[] (A) [h]ealth or safety; (B) environmental, economic or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the

---

[75] K.S.A. § 60-5320(d).

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* § 60-5320(c)(4).

marketplace."[81] Defendant does not address how the *Giglio* letter falls under any of these five options. Nor does he offer any other reasons as to why the *Giglio* letter may be an issue of public interest. Because his argument is not supported by any meaningful analysis, the Court finds that he fails to meet his burden to show that the *Giglio* letter is an exercise of free speech under the statute.

The "right to petition" includes "a communication in or pertaining to . . . an executive or other proceeding before a department of the state, federal government, or other political subdivision of the state"[82] and "a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial or other governmental or official proceeding."[83] Again, Defendant offers very little argument as to how these definitions apply to the *Giglio* letter. He succinctly asserts that the *Giglio* letter pertains to criminal proceedings being prosecuted by the federal, state, and county prosecutors and was reasonably likely to encourage consideration or review by those individuals as to whether Plaintiff could be used as a witness in those cases. But a vague reference to a possible criminal case does not show that the *Giglio* letter pertains to a proceeding before the state or federal government. Furthermore, while the *Giglio* letter may be reviewed by prosecutors, it is not a communication that is likely to encourage review of an issue by a legislative proceeding, an executive proceeding, a judicial proceeding, or any other governmental or official proceeding. Thus, the Court concludes that

---

[81] *Id*. § 60-5320(c)(7)(A)-(E).

[82] *Id*. § 60-5320(c)(5)(A)(iii).

[83] *Id*. § 60-5320(c)(5)(C).

Defendant does not meet his burden to show that the *Giglio* letter is an exercise of his right to petition.[84]

Because Defendant Happer does not meet his burden to show that the KPSPA applies, the Court must deny his Motion to Strike. Plaintiff's defamation claim based on the *Giglio* letter remains in this lawsuit.

**IT IS THEREFORE ORDERED** that Defendant Happer's Motion to Motion to Strike (Doc. 17) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Happer's Motion to Dismiss (Doc. 18) is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's defamation claim as to the *Giglio* letter remains in this lawsuit. All other claims against Defendant Happer are dismissed.

**IT IS FURTHER ORDERED** that the City's and Defendant Happer's Motion to Strike (Doc. 4) is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 11th day of September, 2025.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[84] The parties also dispute whether the KPSPA is substantive law and thus applies in federal court. The Court need not consider this issue because it concludes that Defendant Happer fails to show that the *Giglio* letter is an exercise of the right of free speech or right to petition.